# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

―――――――――――

Nᵒ 05-CV-3969 (JFB)

―――――――――――

## DaShaun Reed,

Petitioner,

VERSUS

## Joseph T. Smith,
### Superintendent,
### Shawangunk Correctional Facility

Respondent.

―――――――――――

MEMORANDUM AND ORDER
April 11, 2006

―――――――――――

Joseph F. Bianco, District Judge:

DaShaun Reed seeks a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his conviction in state court. For the reasons set forth below, his petition is denied.

## I. Background

The evidence at petitioner's trial demonstrated that, on the evening of December 1, 1996, Anthony Gibson carried out a plan of revenge against Teisha Wood's ex-boyfriend because of his belief that her ex-boyfriend had killed his cousin. Gibson lured Wood and her friend, Antoinette Cherry, to a basement with the promise of a marihuana party. Once they arrived, they were surrounded by six armed men–including Reed–who were wearing scarves and masks to conceal their identities. Armed with a gun, a sword, and a stick, petitioner and the other accomplices forced the women to strip. Four of the men then took Woods into a smaller room in the basement, where they raped and sodomized her.

After the men ordered the women to dress, they gagged and bound them, placed them in a car, and drove them to a building at 93 Lewis Avenue, where they were taken to the rooftop by Gibson and petitioner. Gibson ordered the women to sit, and then shot both of them in the head. Cherry died, but Woods survived the assault, which required the removal of a bullet fragment from her scalp.

Reed was charged with two counts of second degree murder under (N.Y. Penal Law § 125.25[1], [3]) and single counts of second degree attempted murder (N.Y. Penal Law §§ 110.00/125.25[1]), first degree kidnaping (N.Y. Penal Law § 135.25[3]), second degree kidnaping (N.Y. Penal Law § 135.20), second degree assault (N.Y. Penal Law § 120.05[2]), second degree criminal possession of a weapon (N.Y. Penal Law § 265.03), and third degree criminal possession of a weapon (N.Y. Penal Law § 265.02[4]). The other participants in the offense were charged with the same crimes under a separate indictment, which also included charges for sex-related offenses for their participation in the rape and sodomy of the victims.

Reed's first trial ended in a mistrial because of an ill juror. After deliberations had begun, a juror informed the judge that he suffered from claustrophobia, and the close confines of the jury room were causing him to experience panic attacks.[1] The trial court questioned the juror to find ways around the problem, including a proposal to waive sequestration only as to him so that he could spend the night in his own bed. The juror explained that he had no control over the situation as he was "terrified of being in an enclosed room for any length of time" and that if he had to return the next day "it would repeat."[2] The juror explained that his panic attacks could cause him to be violent, and the trial judge noted for the record that he appeared visibly shaken.[3] Because no alternatives were available, the trial court declared a mistrial, over Reed's objection.[4]

Reed's second trial ended in a mistrial because the jury was unable to reach a unanimous verdict. At that trial, Woods testified about her ordeal and indicated that, at one point, she heard one assailant refer to another as "Shaun." However, Woods was unable to identify her attackers because their faces were concealed by scarves and masks. Theresa Hines, a friend of the six defendants, also was called as a witness and testified that she was inside the car, with petitioner and other co-defendants, that transported the victims to 93 Lewis Avenue. She testified that, after Gibson and petitioner returned from escorting the victims to the rooftop, they spoke of the murder.

At Reed's third trial, he was convicted on the murder and kidnaping charges. At this trial, in addition to the testimony of Woods and Hines, co-defendant Elliot Johnson testified about petitioner's involvement in the events that led to the shooting of the women. Johnson corroborated Hines' testimony that Gibson and petitioner escorted the victims out of the car to the rooftop at 93 Lewis Avenue. The trial judge sentenced Reed to consecutive prison terms, totaling fifty years to life imprisonment.

Petitioner appealed to the New York Supreme Court, Appellate Division, Second Department (hereinafter "Appellate Division"), arguing, *inter alia*, that his conviction was infirm under the Double Jeopardy Clause of the Fifth Amendment because the trial judge erred in declaring a mistrial in his first trial over his objection. The Appellate Division unanimously affirmed

---

[1] *See* Declaration of Mistrial (hereinafter "D.M."), at 56 (Dec. 4, 1997).

[2] D.M. at 58.

[3] *See* D.M. at 67.

[4] *See* D.M. at 70.

the judgment of conviction.[5] Concerning the Double Jeopardy issue, the court held that the trial court properly discharged the juror and declared a mistrial because the juror's illness rendered him grossly unqualified for jury service, and no alternate juror was available.[6] The New York Court of Appeals denied permission for the petitioner to appeal further, by certificate dated January 30, 2004.[7]

Parallel to his efforts on direct appeal in the New York state court system, petitioner filed a motion to vacate his judgment of conviction, pursuant to New York Criminal Procedure Law § 440.10. In his motion, he claimed, *inter alia*, that his conviction should be vacated because his trial counsel was ineffective for failing to investigate the case, prepare for trial, develop a defense, and present witnesses on the petitioner's behalf. His motion included affidavits from Theresa Hines, who recanted her trial testimony, and three purported alibi witnesses: Angela Coleman, Robert Atkins, and co-defendant Christopher Johnson. The court denied his motion on all grounds, and specifically found that the affidavits that he attached to his motion papers did not establish an alibi and were incredible.[8] The court denied a motion to renew and argue his § 440.10 motion,[9] and the Appellate Division denied leave to appeal from the denial of his motions to vacate the

judgment on August 16, 2004.

By *pro se* application dated August 8, 2005, Reed petitioned this Court for a writ of habeas corpus. In his petition, Reed brings two challenges to his incarceration: (1) that his conviction violated the Double Jeopardy Clause of the Fifth Amendment, a claim which he argued on direct appeal; and (2) that his trial counsel rendered ineffective assistance under the dictates of the Sixth Amendment, a claim which he argued in his Section 440.10 motion to vacate his conviction.

## II. STANDARD OF REVIEW

To determine whether or not a petitioner is entitled to a grant of a writ of habeas corpus, a federal court must apply the standards of review provided in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No 104-132, 110 Stat. 1214, which provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable

---

[5] *See People v. Reed*, 808 N.E.2d 368 (N.Y. App. Div. 2003).

[6] *See id.*

[7] *See People v. Reed*, 1 N.Y.3d 600, 776 (N.Y. 2004).

[8] The court's opinion is attached as Exhibit C to the state record.

[9] The court's opinion is attached as Exhibit H to the state record.

determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2554. "Clearly established Federal law" is comprised of "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams,* 529 U.S. at 413. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.*

AEDPA establishes a deferential standard of review– "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). The Second Circuit has noted that although "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Gilchrist*, 260 F.3d at 93 (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).

## III. DOUBLE JEOPARDY

Reed argues that the state court violated his rights under the Double Jeopardy Clause of the Fifth Amendment. He claims that the trial court erred by declaring a mistrial over his objection, based upon a conclusion that a juror was grossly unqualified to continue serving because of a health condition. In particular, he contends that alternative solutions should have been pursued before concluding that manifest necessity existed for a mistrial. For the reasons stated below, this Court holds that the trial court did not act unreasonably in declaring a mistrial.

It is well-settled that the Fifth Amendment recognizes that once jeopardy is attached, a defendant has a "valued right to have his trial completed by a particular tribunal." *Dunkerley v. Hogan*, 579 F.2d 141, 145 (2d Cir. 1978) (citing *Wade v. Hunter*, 336 U.S. 684, 689 (1949)). "When a mistrial has been declared without a defendant's consent, double jeopardy precludes retrial unless there was 'manifest necessity' to declare the mistrial." *United States v. Huang*, 960 F.2d 1128, 1134 (2d Cir. 1992) (quoting *United States v. Jorn*, 400 U.S. 470, 481 (1971)). However, a trial court must balance the defendant's interests with the "public's interest in fair trials designed to end in just judgments." *Jorn*, 400 U.S. at 480. As the Supreme Court has stated:

> Manifest necessity stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be

served by a continuation of the proceedings.

*Id.* at 485. Moreover, "manifest necessity is not susceptible to a mechanical formulation; each case must be evaluated on its own facts and circumstances." *Huang*, 960 F.2d at 1135 (citing *Illinois v. Somerville*, 410 U.S. 458, 462 (1973)).

This Court finds that the trial judge made an appropriate finding that a juror had to be dismissed because he suffered from claustrophobia–a condition that was resulting in panic attacks that were caused by the close confines in the jury deliberation room. Several courts have found that manifest necessity may exist where a juror suffers from an illness which prevents him or her from fulfilling his or her duties as a member of the jury.[10] An ill juror can compromise the integrity of the deliberation process, as it may impact his or her ability to assess evidence in a case, and increase pressure to "acquiesce in the conclusions of fellow jurors in order to escape more readily from the discomforts of the jury room."[11] This was a particular risk in the instant case, where the juror described his ordeal within the jury room as "torture."[12] Because the juror was grossly unqualified as a result of the illness, and no alternate jurors were available, the court had to declare a mistrial under the dictates of New York law.[13]

The petitioner argues that the trial court did not find the requisite high degree of necessity before declaring a mistrial because other alternatives existed that should have been pursued first. In particular, he claims that the court should have: (1) waited to see if the juror became sick again; (2) waived sequestration as to the particular juror, to allow him to spend nights at home, where he felt more comfortable; or (3) allowed the petitioner to waive his right to a twelve member jury. As explained below, the trial court did not err in deciding that these were not viable alternatives.

With respect to the first two proffered alternatives, the state trial court did in fact conduct a thorough inquiry into the possibility of waiving sequestration as to the affected

---

[10] *Shaw v. Norris*, 33 F.3d 958, 962 (8th Cir. 1994) ("We believe that instances in which a mistrial is declared because of juror illness are similar in kind and nature to those involving juror deadlock, and for the same rationale as stated above, trial courts in these circumstances are to be afforded great deference."); *see also United States v. Holley*, 986 F.2d 100, 104 (5th Cir. 1993) (noting that the trial judge exercised sound discretion in determining that manifest necessity existed for a retrial, where the court determined that an ill juror would not be able to continue); *cf. United States v. D'Amato*, 493 F.2d 359, 366 (2d Cir. 1974) (noting that the district court appropriately declared a mistrial where a juror became disqualified because of claustrophobia).

[11] *Grandison v. Miller*, 1997 U.S. Dist. LEXIS 19915, *13 (E.D.N.Y. Nov. 24, 1997). The state highlighted this specific concern before the trial court. D.M. at 60 ("[I]t is also the concern, if he is subject to [panic attacks], that his vote may not be his honest opinion, it may be a desire to get the hell out of the room.").

[12] D.M. at 63.

[13] N.Y. CRIM. PROC. LAW § 270.35(1) (McKinney 2006) ("If at any time after the jury has been sworn and before the rendition of its verdict, a juror is unable to continue serving by reason of illness or other incapacity . . . the court must discharge such juror. . . . If no alternate juror is available, the court must declare a mistrial pursuant to subdivision three of section 280.10.").

juror and permitting him to deal with his claustrophobia by allowing him to return to his residence each evening. However, the court was convinced that this alternative would be ineffective, following an extensive discussion with the juror. The juror noted that his condition caused him to be "terrified of being in an enclosed room for any length of time" and that if he had to return the next day "it would repeat."[14] Upon being pressed further on the issue, the juror maintained that he would like to be able to return and perform his civic duty, but that he was "so traumatized by having to be in a courtroom."[15] The juror indicated that he would be willing to try a return, but that he had "no control" over the condition, and it could cause him to "lose control in the jury room" and that it might cause him to be "abusive, or violent."[16] The court also noted for the record that the juror was visibly traumatized, as it observed that the juror was shaking while he was sitting in the jury box.[17] Given the substantial risk that the panic attacks would repeat themselves–which would not only create a risk of an inaccurate rushed verdict, but could also potentially pose a physical danger to other jury members–the trial court did not err by concluding that the integrity of the process could not be maintained by retaining the juror, thereby fostering manifest necessity for a mistrial.[18]

Reed also argues that the trial court should have pursued the option of proceeding with deliberations with an eleven member jury before resorting to the option of declaring a mistrial.[19] The trial court did not err in declining to pursue this option, where such an option was not proposed by the defendant, and doing so would violate the plain terms of New York law. N.Y. CRIM. PROC. LAW § 270.35(1) (McKinney 2006) ("If at any time after the jury has been sworn and before the rendition of its verdict, a juror is unable to continue serving by reason of illness or other incapacity . . . the court must discharge such juror . . . If no alternate juror is available, the court *must* declare a mistrial pursuant to

---

[14] D.M. at 58.

[15] D.M. at 62.

[16] D.M. at 64-65.

[17] *See* D.M. at 67. Defense counsel agreed with the court's assessment of the demeanor of the juror while he was sitting in the jury box. *See id.*

[18] The petitioner claims that *Dunkerley v. Hogan*, 579 F.2d 141 (2d Cir. 1978) is instructive, but that case is readily distinguishable. In *Dunkerley*, the

---

trial court declared a mistrial over the defendant's objection because the defendant was not available because of a partially collapsed lung. The Second Circuit reversed, finding that "the apparent availability of at least one alternative to mistrial–adjourning the case for 7 to 10 days–leads us to conclude that a mistrial was not a 'manifest necessity.'" *Id.* at 148. *Dunkerley* is distinguishable because, although the doctors in that case estimated a fairly concrete date at which return would be possible, the juror in the instant case was beset with a psychological condition that involved possibly violent and abusive panic attacks that would likely be triggered by conditions inherently a part of continued service–extended deliberations in a confined space. There was no basis to conclude here that his condition would improve if the case were adjourned. In the instant case, the trial court made a reasonable judgment that waiving sequestration and allowing the juror to return the next day was not an available alternative.

[19] The trial court, in fact, asked defense counsel whether or not they thought proceeding with a jury of eleven was an option. *See* D.M. at 59. Defense counsel answered in the negative and directed the court to focus on the alternative of waiving sequestration as to the ill juror. *See id.*

subdivision three of section 280.10.") (emphasis added). Courts have found manifest necessity for a mistrial where continuing otherwise would establish grounds for reversal on appeal. *Huang*, 960 F.2d at 1135 ("Manifest necessity for a mistrial may also be found where an error has occurred that 'would make reversal on appeal a certainty, [since] it would not serve 'the ends of public justice' to require that the Government proceed with its proof when, if it succeeded before the jury, it would automatically be stripped of that success by an appellate court.").[20]

Finally, Reed claims that the trial court failed to find that there was a sufficient degree of necessity to warrant a mistrial because it was unduly concerned with the costs of continuing the sequestration of other members of the jury. Although it is true that the trial court made several references to the added costs of pursuing the option of waiving sequestration as only to the ill juror,[21] the record does not reflect that this ultimately motivated the court's decision to declare a mistrial. The trial judge explicitly noted that the expense issue was "secondary," and that the critical issue that he had to decide in determining whether or not the juror would be able to effectively deliberate if he was allowed to spend the night at home.[22]

In sum, because this Court has determined that the trial court acted reasonably in determining that manifest necessity existed for declaring a mistrial, the petitioner's Double Jeopardy claim is rejected.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Reed claims that he received ineffective assistance of counsel during the state trial which resulted in his conviction, in violation of the Sixth Amendment. Specifically, he argues that his trial counsel was deficient in failing to investigate or call alibi witnesses. For the reasons stated below, this Court finds that petitioner's counsel was not constitutionally ineffective.

Under the standard promulgated by *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984), a petitioner is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel, that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

---

[20] Reed correctly points out the fact that, subsequent to the declaration of the mistrial in his case, another New York trial court held that waiver of a 12-member jury is permissible in similar circumstances. *See People v. Gajadahar*, 753 N.Y.S.2d 309 (N.Y. Cnty. 2002). The situation in the instant case is distinguishable from *Gajadahar* because, even assuming a waiver was legally permissible, defense counsel in the instant case explicitly rejected that option. *See* D.M. at 59. The trial court cannot be faulted for failing to consider a waiver option to be a viable alternative to mistrial where it was rejected as an option by defense counsel, foreclosed by plain statutory text, and not supported by any direct authority at the time of the decision.

[21] *See* D.M. at 60, 64.

[22] D.M. at 66-67 ("Well, the expense is secondary. The thing is, can we rely on a statement, that if he is allowed to go home and return tomorrow, he will be able to deliberate? It appears to me, that he won't be able to.").

proceeding would have been different."[23]

The first prong requires a showing that counsel's performance was deficient. However, constitutionally effective counsel embraces a "wide range of professionally competent assistance," and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). The performance inquiry examines that reasonableness of trial counsel's actions under all circumstances, keeping in mind that a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Id.* (quoting *Rompilla v. Beard*, 545 U.S. ___, 125 S.Ct. 2456, 2478 (2005)). In assessing performance, a court must apply a "heavy measure of deference to counsel's judgments." *Greiner*, 417 F.3d at 319 (quoting *Strickland*, 466 U.S. at 691). "A lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision, *DeLuca v. Lord*, 77 F.3d 578, 588 n.3 (2d Cir. 1996), and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* (citing *Strickland*, 466 U.S. at 690-91). Moreover, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.*

The second prong focuses on prejudice to the petitioner. The petitioner is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In this context, "reasonable probability" means that the errors were of a magnitude such that it "undermines confidence in the outcome." *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 694). "[T]he question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Henry v. Poole*, 409 F.3d 48, 63-64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695).

This Court proceeds to examine each prong in turn, keeping in mind that the habeas petitioner bears the burden of establishing both deficient performance and prejudice. *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004). As set forth below, the petitioner's claim fails to satisfy either element.

A. Deficient Performance Inquiry

Reed specifically argues that his trial counsel's performance was deficient because he alleges that his counsel failed to conduct any investigation into, or call, possible alibi witnesses. "[T]he tactical decision of whether to call specific witnesses–even ones that might offer exculpatory evidence–is ordinarily not viewed as a lapse of professional representation." *United States v. Schmidt*, 105 F.2d 82, 90 (2d Cir. 1997); *see also United States v. Romero*, 54 F.3d 56, 60 (2d Cir. 1995). However, unexplained failures to call credible alibi witnesses cannot be considered reasonable trial strategy. *See Pavel*, 261 F.3d at 217-20. Moreover, the failure to

---

[23] *See also Campusano v. United States*, No. 04-5134, slip op. at 8167 (2d Cir. Mar. 23, 2006) (reciting *Strickland* standard).

investigate potential alibi witnesses is particularly egregious. *See id.* at 220-22 & nn. 13-14; *see also Lindstadt v. Keane*, 239 F.3d 191, 199-204 (2d Cir. 2001).

As a threshold matter, although courts may hold an evidentiary hearing to allow an allegedly ineffective attorney an opportunity to be heard and to present evidence, *Sparman v. Edwards*, 154. F.3d 51, 52 (2d Cir. 1998), this Court finds that such an inquiry is unnecessary here based on a review of the available state court record. The record, as discussed and cited *infra*, includes both trial testimony and affidavits submitted by the petitioner which are replete with references to the strategy that Reed's counsel employed in this case, which was to refrain from calling alibi witnesses with credibility issues who could be easily attacked on impeachment, while concentrating on impeaching the credibility of the State's witnesses, to leave the jury's focus on an argument that the State had not met its burden of proof.[24]

Although the petitioner lists a host of individuals who he claims that his counsel should have investigated, this Court must focus on those individuals for which he provided specific evidence of their potential alibi testimony before the state court because petitioner cannot demonstrate prejudice for not obtaining alibi testimony for which he cannot demonstrate the content.[25] This Court's inquiry is therefore focused on potential alibi testimony from three individuals: Angela Coleman, Robert Atkins, and co-defendant Christopher Johnson.[26] [27]

---

[24] Reed's counsel impeached the state's two witnesses by attacking the reliability of the victim's identification of petitioner (which relied solely upon hearing the name "Shaun" uttered during the commission of the offense) and by impeaching the other identifying witness, Hines, by pointing to inconsistencies in prior statements that she made regarding who she witnessed to be present. The adoption of this strategy was confirmed by the affidavits of the alleged alibi witnesses–Coleman claims that Reed's counsel told her that she did not need to testify because he had already gotten two mistrials, and the "D.A. is full of shit." Similarly, Atkins' affidavit states that Reed's counsel informed him that his testimony was unnecessary because the state's "witness is weak and the jury will not believe her." This strategy was at the very least effective in petitioner's second trial, which resulted in a mistrial because of a hung jury.

[25] *Cf. Kanani v. Phillips*, 2004 WL 2296128, at *28 (S.D.N.Y. Oct. 13, 2004) ("The habeas court will not second-guess trial strategy simply because the chosen strategy has failed, *especially where the petitioner has failed to identify any specific evidence or testimony that would have helped his case if presented at trial*.") (internal citations omitted) (emphasis added).

[26] The petitioner's Notice of Alibi was attached to his motion to vacate judgment, under N.Y. CRIM. PROC. LAW. § 440.10, which was included as Exhibit A to the state record, also included references to LaVaughn Curry and Richardene Taylor. His § 440.10 motion did not include any affidavits from Curry or Taylor, and did not otherwise mention how they would have been useful as possible alibi witnesses.

[27] Reed's § 440.10 motion also included an affidavit from Theresa Hines, sworn on November 1, 2001, in which she purportedly recanted her trial testimony and claimed that the petitioner was never at the crime scenes. In his § 440.10 motion, Reed argued that the state knowingly permitted Hines to testify falsely, an argument which the Supreme Court rejected because it found the proof of recantation unreliable, highlighting the fact that her signature was inconsistent in various documents and that she was the subject of threats to not testify at trial. Petitioner did not allege that she was an alibi witness that his counsel failed to investigate and call to the stand at his trial, and

As a threshold matter, the record does not support Reed's contention that his counsel failed to perform any investigation into the potential alibi witnesses. Moreover, apart from the issue of investigating these alibi witnesses, the petitioner also cannot demonstrate that his trial counsel was deficient in failing to call these alibi witnesses.[28] As set forth below, the reasonableness of counsel's strategic decision for not calling each of these witnesses is clear from the record.

With respect to Robert Atkins, it is abundantly clear from the trial record that counsel spoke to Atkins, that Atkins reported to court as a defense potential witness, and that the petitioner decided not to call Atkins based on the recommendation of his counsel. In fact, with Mr. Atkins waiting outside the courtroom, the trial court confirmed directly with the petitioner that he concurred with his lawyer's recommendation not to call Atkins.[29]

Therefore, the record demonstrates that counsel reasonably investigated the possibility that Atkins could be called as an alibi witness and, with petitioner's concurrence, the strategic decision was made not to call him. In fact, in his affidavit, Mr. Atkins states that counsel, outside the courtroom, explained that he would not need him to testify "because the District Attorneys' [sic] witness is weak and the Jury will not

---

again here.

THE COURT: Is that him?

[Counsel]: Yes.

THE COURT: Step outside.

[Counsel]: I'm sorry, your Honor. He is unversed in the courtroom procedures. I spoke with him, and I spoke to Mr. Reed. And I told Mr. Reed, I don't believe we should call Mr. Atkins.

THE COURT: You don't have to give me any reasons.

[Counsel]: I am not going to give you a reason.

THE COURT: You did discuss it with your client?

[Counsel]: And I told him I would call him if he asked me to. Although, I could make that decision, I told him I would defer to him. And he concurs with me in not calling him.

THE COURT: Is that correct, Mr. Reed?

THE DEFENDANT: Yes..

First Trial Transcript (hereinafter "Tr1."), at 237 (Dec. 1, 1997).

---

there is no reason for the Court to consider counsel's performance as to this witness as part of the ineffective assistance claim in the instant petition–counsel could not be unreasonable for not calling a witness who had already been called by the prosecution. In any event, counsel did appropriately cross-examine Hines regarding inconsistent statements that she had made to the authorities about who was present in the vehicle that took the victims to the building where they were shot.

[28] This analysis assumes *arguendo* that the alibi witnesses would have testified at trial as they testified in their affidavits.

[29] THE COURT: You mentioned something about an alibi witness?

[Counsel]: Yes. One of the persons named in the notice of alibi arrived very shortly ago. I had spoken to him last night on the phone. And I spoke with him

believe her."[30] For purposes of habeas review, there is no basis for second-guessing that strategic decision.

As with Atkins, the state court record confirms that trial counsel spoke to Angela Coleman about her potential testimony as an alibi witness. Specifically, Coleman stated in a post-trial affidavit[31] that she spoke to petitioner's counsel on three separate occasions, including two office visits and a telephone call.[32] She noted that trial counsel later told her that her testimony would not be necessary and, in explaining that decision, made a comment about the weakness of the State's case.[33]

Declining to call Coleman to testify was not deficient, as there was a reasonable strategy for doing so. As a threshold matter, it was not clear that the testimony would have provided an actual alibi because Coleman only claims that petitioner was never at the crime scenes in a conclusory manner and does not state the basis for that conclusion. In other words, she does not specifically claim that she was present at the crime scene or with the petitioner when the crimes took place. In any event, even assuming that her testimony would have been helpful to the defense, there were significant reliability issues with respect to Coleman's purported alibi testimony because it included inconsistencies with a prior affidavit that she had endorsed. In the affidavit provided by the petitioner in his § 440.10 motion, dated October 14, 2002, Coleman claims that she first saw petitioner when he drove by her on the street and she requested a ride home. The state's opposition to petitioner's § 440.10 motion, included as Exhibit B to the state court record, includes another affidavit signed by Coleman on June 3, 1997, which claims that Elliot Johnson was the individual who picked her up, and that Johnson drove the vehicle to another house to pick up petitioner. Given the inconsistency with her prior statements, it was plainly reasonable for petitioner's counsel to refrain from calling her as an alibi witness.

Finally, although no evidence exists on the record which might demonstrate that petitioner's counsel made any attempt to investigate the possible use of Christopher Johnson as an alibi witness, this Court does not find that constitutes deficient performance under the facts of the instant case. Assuming *arguendo* that his counsel failed to investigate Johnson, such an omission was patently reasonable here, where criminal charges were pending against Johnson at the time for involvement in the same offense, and the basis for the alibi was adverse to his pending innocence defense.[34] Furthermore, his

---

[30] Robert Atkins' affidavit was attached to the petitioner's motion to vacate judgment, under N.Y. Crim. Proc. Law § 440.10, which was included as Exhibit A to the state court record.

[31] Angela Coleman's affidavit was also attached to the petitioner's motion to vacate judgment, under N.Y. Crim. Proc. Law § 440.10, which was included as Exhibit A to the state court record.

[32] *Id.* ("I spoke to [petitioner's counsel] on 3-different [sic] occasions, twice I've visited [sic] [counsel] and once over the phone on Feb. 4, 1998.").

[33] *Id.* ("I beeped [petitioner's counsel] and he never called me back, about me testifying on [petitioner's] behalf, [sic] after a long wait when I finally got in touch with [counsel]. His response to me was he doesn't need me to come because [petitioner] already had 2-mistrials [sic] and the D.A. is full of shit.").

[34] Christopher Johnson's affidavit (also attached to petitioner's state court § 440.10 motion), which was authored four years after the petitioner's trial,

purported alibi testimony only states that petitioner was not at the crime scene in a conclusory manner, and the only basis for this statement–that Johnson was at the crime scene while petitioner was not–would be extremely vulnerable to cross-examination, since Johnson was contesting his innocence in a parallel proceeding at the same time.

In sum, this Court finds that there is no good reason to second-guess the performance of petitioner's counsel here. The record demonstrates that he did perform some investigation into the alibi witnesses. Moreover, the reliability of the purported alibi witnesses was certainly questionable enough to ratify his strategy of refraining from calling them, while instead concentrating on challenging the sufficiency of the State's case by attacking the credibility of their witnesses. A host of other courts have found this strategy reasonable in similar circumstances.[35]

Based on this Court's review of the state court record, the performance of petitioner's counsel was not deficient.

## B. Prejudice Inquiry

Even if the petitioner were able to show that his counsel's performance was constitutionally deficient, his ineffective assistance claim would nevertheless fail because he has not met his burden to show that any such failure caused him prejudice. Reed's petition merely includes the bald assertion that the alibi witnesses would have "thoroughly discredited" co-defendant Elliot Johnson's testimony. As previously stated, this is not true, as the alleged alibi testimony had serious reliability issues, and none of it could actually account for petitioner at the time of the crime.[36] There is no basis to conclude that any of the proposed alibi testimony would have undermined the State's evidence, particularly the testimony of (1) Hines that she was in the car, with petitioner, that transported the victims to the rooftop at 93 Lewis Avenue, and heard petitioner and

_____

simply indicates that he did not observe petitioner at the residence at which the victims were raped and sodomized on the night of the attack. At the time of Reed's trial, Johnson was still contesting his guilt as to the offense–the Appellate Division did not resolve his sufficiency of the evidence challenge to his conviction until Feb. 7, 2000, *see People v. Johnson*, 702 N.Y.S.2d 567 (N.Y. App. Div. 2000)–and thus could not have made the statement without undermining his defense.

[35] *See, e.g., Lawson v. Caspari*, 963 F.2d 101294, 1096 (8th Cir. 1992) (holding that counsel was not ineffective for failing to call alibi witnesses he did not believe were credible, especially where counsel presented a theory of the case by pointing out the weaknesses in the state's case and raising credibility questions regarding the state's witnesses); *see also Johnson v. Mann*, 1993 WL 127954, at *1 (S.D.N.Y. Apr. 20, 1993) (holding that counsel was not ineffective for strategic decision to focus strategy on attacking the reliability of testimony identifying petitioner

_____

where alibi witnesses were "inherently suspect").

[36] *See, e.g., Bonilla v. Portuondo*, 2004 WL 1782174, at *10 (S.D.N.Y. Aug. 9, 2004) (finding no prejudice for not discovering alleged alibi witness where witness could not account for the location of the petitioner at the time of the crime); *see also Yiu v. Keane*, 2004 WL 1110329, at *10 (S.D.N.Y. Apr. 29, 2004) (finding no prejudice where purported alibi witnesses could not shed light on actions of petitioner at critical juncture, and state court's conclusions that testimony was not compelling was not unreasonable); *Gossett v. Henderson*, 1991 WL 135601, at *7 (S.D.N.Y. Jul. 8, 1991) (finding no prejudice where petitioner failed to show that investigating alibi defense would have yielded witnesses who could have provided information as to the petitioner's presence at the time of the crime).

another individual discuss the murder after they returned from escorting the victims to the rooftop, as well as (2) co-defendant Elliot Johnson, corroborating Hines, including testimony about the petitioner's substantial involvement in the events that led to the shooting of the two women.

Because the petitioner has failed to meet his burden demonstrate either of the *Strickland* elements, the state court was not unreasonable in denying his ineffective assistance of counsel claim.[37]

### V. CONCLUSION

For the foregoing reasons, Reed's petition for a writ for habeas corpus is DENIED. Because Reed has failed to make a substantial showing of a denial of a constitutional right,

no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2).

The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: April 11, 2006
Brooklyn, NY

---

[37] The petitioner suggests that this Court is required to grant habeas petition because the state court applied the "meaningful representation" standard, citing *Henry v. Poole*, 409 F.3d 48 (2d Cir. 2005). Although *Henry* discussed problems with the "meaningful representation" test, it refrained from basing its decision on a holding that the test is "contrary to" clearly established law because the Second Circuit panel was bound by three prior panel decisions holding otherwise. *See id.* at 69-70 (citing *Lindstadt,* 293 F.3d at 198; *Loliscio v. Goord*, 263 F.3d 178 (2d Cir. 2001); *Eze v. Senkowski*, 321 F.3d 110, 122-24 (2d Cir. 2003)). Rather, *Henry* found that the New York Court of Appeals' denial of the petitioner's ineffective assistance claim was the result of an *unreasonable application* of the *Strickland* standard, following an analysis that concluded that petitioner deserved to prevail on the merits of his ineffective assistance claim. *See Henry*, 409 F.3d at 62-68, 71-72. Because this Court holds that petitioner did not deserve to prevail on the merits of his ineffective assistance claim under the *Strickland* standard, the Court cannot find that the state court unreasonably applied *Strickland*.